Filed 8/19/24  P. v. Jordan CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C092147 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2018-0006959) |
| v. | |
| DEANDREW JORDAN, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

In March 2019, a jury found defendant Deandrew Jordan guilty of multiple gang offenses and enhancements after he and two associates each fired a number of gunshots at other individuals in a Stockton strip mall parking lot, severely injuring one victim, C.A. Defendant received an indeterminate term of 55 years to life, plus a determinate term of 40 years 4 months.

1

In February 2023, we reversed two counts of actively participating in a criminal street gang, one count of carrying a concealed firearm in a vehicle as an active participant in a criminal street gang, and one count of carrying a loaded firearm in a vehicle as an active participant in a criminal street gang, and we vacated true findings on a gang-related firearm enhancement as well as multiple gang enhancement allegations. We vacated defendant's sentence and remanded the matter to the trial court to provide the prosecution with the opportunity to retry the reversed gang counts and allegations under the law as amended by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) (Stats. 2021, ch. 699), which amended Penal Code section 186.22 to impose new substantive and procedural requirements for gang allegations and the substantive offense of gang participation. (Further undesignated statutory references are to the Penal Code.) We also concluded that defendant was entitled to a full resentencing hearing given amendments to section 1170, subdivision (b) under Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567) (Stats. 2021, ch. 731) that went into effect while defendant's appeal was pending.

Regarding the gang charges and enhancements, we held that the collective engagement requirement of newly amended section 186.22 required that a predicate offense be committed with at least one other gang member, and that there was insufficient evidence of the participation of another gang member in the predicate crimes. At the time, appellate courts were split on this issue. The California Supreme Court granted review and has now transferred the matter to us with directions to vacate our decision and to reconsider the cause in light of *People v. Clark* (2024) 15 Cal.5th 743 (*Clark*).

We do so now and hold that we must reverse the gang-related counts and vacate the true findings on the gang enhancements because on this record we cannot conclude beyond a reasonable doubt that failing to instruct the jury on amended section 186.22's new elements, including the requirement to prove that there exists an organizational

nexus between the predicate offenses and the gang, did not contribute to the verdicts. We shall remand the matter to the trial court to provide the prosecution with the opportunity to retry the gang counts and enhancements, if it chooses, and to provide defendant with a full resentencing hearing.

## BACKGROUND

Defendant was charged with attempted premeditated murder (§§ 664, 187; count 1), three counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 2-4), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5), two counts of active participation in a criminal street gang (§ 186.22. subd. (a); counts 6 & 14), two counts of possession of a firearm with a prior violent felony conviction (§ 29900, subd. (a)(1); counts 7 & 8), possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 9), carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(3); count 10), carrying a concealed firearm in a vehicle as an active participant in a criminal street gang (§ 25400, subd. (c)(3); count 11), and two counts of carrying a loaded firearm in a vehicle as an active participant in a criminal street gang (§ 25850, subd. (c)(3); counts 12 & 13).

The information alleged defendant had been convicted of a prior strike (§§ 1170.12, subd. (b), 667, subd. (d)), and that he had served prior prison terms (§ 667.5, subd. (b)). Additionally, the information contained the following allegations attached to the counts noted: defendant had a prior serious felony conviction within the meaning of section 667, subdivision (a); counts 1-6, gang enhancement allegations (§ 186.22, subd. (b)(1); counts 1-5, 7-9), personal use of a firearm (§ 12022.53, subd. (b); count 1), personally and intentionally discharging a firearm proximately causing great bodily injury (§ 12022.53, subd. (d); count 1), a principal who violated section 186.22 used a firearm causing great bodily injury (§ 12022.53, subd. (e)(1); count 1), intentional and personal discharge of a firearm (§ 12022.53, subd. (c); count 1), and use of a firearm in the commission of a felony (§ 12022.5, subd. (a); counts 2-4).

3

*The Charged Offenses*

At approximately 11:37 a.m. on December 19, 2017, Stockton Police Officer Kristen McClure heard gunshots and drove towards the gunfire. Dispatch directed her to a shopping center where the Bianchi Market was located. When she arrived, she saw C.A. lying on the sidewalk. McClure lifted his sweatshirt and saw what appeared to be gunshot wounds, one on the right side of his back and a second on his stomach. McClure did not find any weapons on C.A. and did not see weapons or cartridge casings near him. C.A. sustained a "through and through" gunshot wound to the abdomen. It was a critical, life-threatening injury.

At the scene, police found nine .45-caliber cartridge casings grouped near the nearby railroad tracks, 10 .40-caliber cartridge casings mostly grouped near Ray's Chicken and Fish Market, and 12 .223-caliber cartridge casings, which are typically fired from a rifle, mostly grouped in front of the African Beauty Supply store. There were no cartridge casings found in the area where C.A. had been.

Detective Sat Le reviewed video surveillance footage from the security system in the Bianchi Market. In the video, defendant pulled into the parking lot driving a dark Ford Fusion. He and two passengers, a juvenile named Kashmoney and another individual named Rodney, got out of the car, went into the market, and then came back out. Defendant and at least one of the passengers also talked with one or more people in the parking lot. At 10:37 a.m., the Ford Fusion departed.

Approximately five minutes later, the Ford Fusion returned. At some point, in video from the market, three males can be seen walking east in the direction of the railroad tracks. Subsequently, two of those three males can be seen running back to the west. Kashmoney can be seen holding a rifle. He can be seen shooting the rifle in front of a store and then running. Rodney pointed a gun and pulled the trigger. Defendant can also be seen entering the frame holding something in his hand. He then ran in the

4

direction of the Ford Fusion. Subsequently, the Ford Fusion exited the parking lot very quickly. Detective Le initially testified he could not discern what defendant had in his hand in the video. However, he was recalled and described viewing the video after zooming in. He testified defendant had a gun in his right hand.

Because Kashmoney shot the rifle, corresponding to the .223-caliber casings, and Rodney shot a gun in front of the market, corresponding to the location of the .40-caliber casings, Detective Le concluded defendant shot the .45-caliber rounds found near the railroad tracks.

A week later, on December 26, 2017, Officer Doug Sheldon performed a traffic stop of a dark Ford Fusion. Defendant was the driver, and three other individuals were in the car. In a search of the vehicle, on the floor of the backseat area, law enforcement located a rifle underneath a sweatshirt and two cell phones. Law enforcement also found a Glock .40-caliber handgun under the front passenger seat.

The next day, Officer Robert Barrington performed a vehicle stop. The driver was James Ruiz. Barrington recovered from the car a .45-caliber Ruger P90 semiautomatic handgun with an extended magazine. He also recovered two cellular phones. In a video extracted from one of the phones, defendant lifted his waistband to show the butt of a firearm with a protruding magazine. That video was recorded on December 18, 2017, the day before the shooting. According to a firearms and ballistics expert, the .45-caliber cartridge casings found at the scene of the shooting were fired from the Ruger P90 recovered from the car driven by Ruiz.

*Gang-related Evidence*

Detective Julio Morales, who worked in the Stockton Police Department's gang suppression unit, testified as an expert in African American gangs in Stockton. His duties included monitoring gang members' criminal activity, their alliances and rivalries, and areas with high crime and high gang activity. He had spoken with numerous gang

5

members, monitored social media, and had participated in multiple wiretap operations related to local gangs to learn how they functioned and how they perform their activities.

Detective Morales testified the Northside Gangsta Crips (NSGC) criminal street gang, with approximately 160 members, was one of the larger Crips sects in Stockton. NSGC identified with the numbers four or 44, representing the 4400 block of Townehome, and the numbers five or 500 for the 500 block of Bianchi. They had corresponding hand signs for those numbers, as well as a hand sign representing the name Tribe. Morales testified the gang was frequently seen around the Bianchi Market. NSGC's primary activities included homicide, attempted homicide, possession of weapons by a prohibited person, burglary, robbery, conspiracy to commit murder, and manslaughter, and its primary focus was to make money through these criminal activities. The gang did not have a formal leadership structure but operated more on an "understanding and a respect" basis.

Morales testified defendant had a tattoo memorializing a NSGC member who had been killed, and that defendant appeared in several photographs in which he and other individuals were throwing gang signs. Defendant also appeared in several music videos with other known NSGC gang members; the videos contained lyrics filled with gang and gun violence references and one was filmed at the same market in the territory claimed by the NSGC gang where the victim was shot. Morales also testified defendant had been convicted of a robbery in September 2013, a primary activity of NSGC.

According to Morales, defendant was an active participant in NSGC and Kashmoney was a documented NSGC member. Morales also testified that he had enough information to document Rodney as an NSGC member, although he may have associated with a different gang in the area as well.

To prove the requisite pattern of criminal gang activity, the prosecution introduced certified convictions for three active NSGC gang members. These included: gang member Michael Young's conviction for being a felon/addict in possession of a firearm

6

in March 2014, gang member Jeffrey Taylor's convictions for manslaughter and second degree robbery in June 2016, and gang member James Ruiz's convictions for being a felon/addict in possession of a firearm and active participation in a criminal street gang in August 2016.[1]

Morales opined that, if a crime was committed mirroring the facts of this case, that crime was committed in association with the gang. It would also benefit the gang in several ways. The members were protecting their neighborhood. The gang's reputation would be enhanced among gang members and the shooting would instill fear in rivals and the community. And the members proved their loyalty to the gang and to one another by demonstrating a willingness to act if needed.

### The Defense

Kashmoney was 16 at the time of the shooting. He testified that he alone fired a gun in the Bianchi Market parking lot because he was acting in self-defense when someone shot at him. He had admitted to "[a]ssault with a semi rifle at three people."

A woman who was in the parking lot testified she saw someone by the railroad tracks firing a handgun. The shooter then ran north along the tracks. She could not see the shooter's face. She only saw his profile.

A resident of an apartment complex across the street from the Bianchi Market testified that, on December 19, 2017, she heard gunfire. When she looked out the window, she saw a Black male running north on the train tracks, but she did not see his face or whether he had a gun.

---

[1] The certified records of conviction for Ruiz's no contest plea, including the abstract of judgment, plea minutes, and the information, do not identity a specific gang for his active gang participation conviction.

7

*Verdict and Sentencing*

The jury found defendant guilty on all counts except count 13, one of two counts charging him with carrying a loaded firearm in a vehicle as an active participant in a criminal street gang. The jury also found all enhancement and other allegations true.

In a bifurcated court trial, the trial court found true the allegation that defendant had sustained a prior serious felony conviction and that he had served a prior prison term.[2] Prior to sentencing, the trial court denied defendant's requests to strike a strike prior (see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) and to strike firearm enhancements, but granted his request to strike all section 667, subdivision (a) enhancements. The trial court sentenced defendant to an indeterminate term of 15 years to life on count 1, doubled to 30 years to life, plus 25 years to life for the section 12022.53, subdivision (d) enhancement, for a total indeterminate term of 55 years to life. The court stayed execution of sentence on the other enhancements attached to count one. The court imposed an aggregate determinate term of 40 years 4 months, consisting of the upper term of nine years on count 3, doubled to 18 years, plus 10 years for the section 12022.5, subdivision (a) enhancement; one-third the midterm on count 4, doubled to four years, plus one year four months, one-third the midterm on the section 12022.5, subdivision (a) enhancement; one-third the midterm on count 7, doubled to one year four months, plus one year, one-third the midterm on the section 186.22, subdivision (b)(1) enhancement; one-third the midterm on count 8, doubled to one year four months, plus one year, one-third the midterm on the section 186.22, subdivision (b)(1) enhancement; and one-third the midterm on count 9, doubled to one year four months, plus one year,

---

[2]     In orally pronouncing sentence, the trial court neither imposed terms on the section 667.5, former subdivision (b) prior prison term enhancements nor struck those enhancements, and they do not appear on the abstract of judgment. However, because we are remanding for a full resentencing, the issue is moot.

one-third the midterm on the section 186.22, subdivision (b)(1) enhancement. The remainder of the terms were imposed and stayed under section 654.

## DISCUSSION

## I

### *Assembly Bill No. 333*

Assembly Bill 333, which applies retroactively to defendant's nonfinal case (*People v. Tran* (2022) 13 Cal.5th 1169, 1206-1207; *In re Estrada* (1965) 63 Cal.2d 740), "amended section 186.22 to impose new substantive and procedural requirements for gang allegations and the substantive offense of gang participation." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477; accord, *Tran*, at p. 1207; *People v. Sek* (2022) 74 Cal.App.5th 657, 665.)

### A. *Amendments to Section 186.22*

Effective January 1, 2022, Assembly Bill 333 made several significant changes to subdivisions (e) and (f) of section 186.22.[3] As relevant here, Assembly Bill 333 narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, *organized* association or group of three or more persons."[4] (§ 186.22, subd. (f), italics added.) It also changed former subdivision (f)'s requirement that a gang's

---

[3] Assembly Bill 333 also amended the Penal Code to add section 1109, which requires bifurcation of section 186.22 gang enhancement allegations and gang-participation offenses upon request by the defendant. (§ 1109, subds. (a)-(b).) The California Supreme Court has now held that section 1109 does not apply retroactively. (*People v. Burgos* (2024) 16 Cal.5th 1, 8 [concluding the *Estrada* inference of retroactivity did not extend to section 1109].)

[4] Amended section 186.22, subdivision (f) provides: "As used in this chapter, 'criminal street gang' means an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, *and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity*." (Italics added.)

9

members "individually *or collectively* engage in" a pattern of criminal activity in order to constitute a "criminal street gang" to now require that any such pattern be "*collectively* engage[d] in" by members of the gang.  (§ 186.22, subd. (f), italics added.)

Assembly Bill 333 further narrowed the definition of a "pattern of criminal gang activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.[5]  (§ 186.22, subd. (e)(1), (2).)

Assembly Bill 333 also narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational."  (§ 186.22, subd. (g).)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (*Ibid.*)

Finally, Assembly Bill 333 deleted certain nonviolent offenses from the list of offenses that could make up a gang's primary activities or form the requisite pattern of criminal gang activity.  (Compare § 186.22, former subd. (e)(1)-(33), as amended by

---

[5]      Amended section 186.22, subdivision (e)(1) provides in relevant part that a " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, *the offenses were committed on separate occasions or by two or more members*, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational . . . ."  (Italics added.)

10

Stats. 2017, ch. 561, § 178 with § 186.2, subd. (e)(1)(A)-(Z).) The offenses that now qualify were reduced from 33 to 26. (*Clark, supra*, 15 Cal.5th at p. 753.)

B.      *"Collective Engagement" under* Clark

The Supreme Court in *Clark* resolved the appellate conflict regarding the meaning of the collective engagement requirement in amended subdivisions (e) and (f) of section 186.22, rejecting the notion that each predicate offense had to be committed by two or more gang members acting together. (*Clark, supra*, 15 Cal.5th at pp. 749, 753-757.) Having found that individual gang members could commit predicate offenses alone, the court then considered what was necessary to establish the new collective engagement element under the amended statute. (*Id.* at p. 757.)

The court found that to show collective engagement, the prosecution must "link[] the two predicate offenses to the gang as an organized, collective enterprise." (*Clark, supra*, 15 Cal.5th at p. 761, fn. omitted.) That is, there must be "a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole." (*Id.* at p. 762.) "This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles." (*Ibid.*)

The Supreme Court cautioned, however, that by referring to these elements of a gang's affairs and operations, it did not intend to "overstate the degree of formality required[,]" recognizing that some gangs are loosely structured while others are highly ordered and disciplined with a well-defined hierarchy, and that some gangs may have loosely defined goals and principles while others may have clearly defined missions. (*Clark, supra*, 15 Cal.5th at p. 762.) "Given this variability," the court acknowledged that collective engagement could be established in different ways. (*Ibid.*)

*Clark* provided examples of the types of evidence that potentially could show the requisite collective engagement, including: (1) a direct order from the gang to commit

11

specific crimes (e.g., *People v. Lewis* (2021) 11 Cal.5th 952, 958 [the murder would have been agreed on at a meeting called by the gang's shot caller]); (2) a more general, well-understood expectation that members must engage in certain types of offenses (e.g., *People v. Elizalde* (2015) 61 Cal.4th 523, 528 [junior members received a general order to attack rivals to support the gang and earn their status]); or (3) a demonstration that the offenses reflect the primary activities of the gang, or else adhere to a common goal or plan characteristic of the gang in question (e.g., *People v. Johnson* (2013) 57 Cal.4th 250, 256 [members played different roles in carrying out the gang's activities, either selling drugs, patrolling the gang's territory, or killing rivals]; *People v. Chhoun* (2021) 11 Cal.5th 1, 16 [a gang's complex robberies followed a common plan of targeting similar victims and relying on members to play specific roles]). (*Clark, supra*, 15 Cal.5th at pp. 762-763.) Other cases might include evidence showing: (4) a gang tasked members with collecting "taxes" from local businesses or drug dealers as a way of maintaining the gang's territory; (5) the gang directed members to sell drugs in the gang's territory with the proceeds from the sales used to benefit the gang; (6) gang members were authorized to attack rivals on a "green light list" maintained by the gang; or (7) one member of a gang sold drugs for the gang while a second murdered a rival drug dealer and a third hid the murder weapon. (*Clark*, at p. 763.)

While the above examples include evidence that may also be relevant to the common benefit element of section 186.22, the Supreme Court stressed that the collective engagement element is "conceptually distinct from the requirement to prove that each predicate offense 'commonly benefited' the gang (§ 186.22(e)(1)), even though the facts necessary to prove the two requirements will often overlap with one another." (*Clark, supra*, 15 Cal.5th at p. 763.) The core inquiry for the collective engagement element, as previously noted, is "whether there exists an organizational nexus between the crime and the gang." (*Ibid.*)

C. *Applicable Standard of Review*

The changes Assembly Bill 333 made to section 186.22, and *Clark*'s interpretation of the organizational nexus requirement under the statute as amended, effectively added new elements to the statute and altered the showing necessary to establish gang offenses and allegations. It is undisputed that the jury was not instructed on these new elements at the time of defendant's trial. The incomplete jury instructions were therefore deficient. Because this instructional error implicates defendant's federal constitutional rights, defendant is entitled to a remand for further proceedings unless the lack of instruction on these new elements is harmless beyond a reasonable doubt. (*Clark, supra*, 15 Cal.5th at p. 763; *Chapman v. California* (1967) 386 U.S. 18, 24.)

With this understanding of amended section 186.22's new requirements, and the applicable standard of review, we turn to the parties' arguments and the evidence presented below.

D. *Analysis*

In his supplemental brief following transfer, defendant argues that the evidence at trial failed to establish the necessary collective engagement under *Clark* because Detective Morales did not testify regarding the organizational structure of the gang and its nexus to the predicate offenses. His testimony, according to defendant, did not elucidate how the gang operated or would benefit beyond vague reputational terms. Defendant asserts the error is not harmless beyond a reasonable doubt, thus requiring reversal and remand to afford the prosecutor an opportunity to offer additional evidence to satisfy the newly enacted requirements of section 186.22.

The People assert the predicate offenses still qualify under the amended law because they show the requisite organizational nexus to the gang as well as a common benefit that was more than reputational, noting the crimes could have benefited the gang financially. Because in their estimation the jury would have found the gang enhancement

13

allegations true and found defendant guilty of the substantive gang offenses beyond a reasonable doubt had it been properly instructed with the new law, remand is unwarranted. On this record, we conclude defendant has the better argument. To establish the required predicate offenses, the prosecution introduced evidence that three different gang members had committed various offenses on separate occasions. These included convictions for illegally possessing a firearm, manslaughter, second degree robbery, and actively participating in a criminal street gang. But nothing in the record shows the People presented evidence linking the predicate offenses to the organizational structure of the NSGC gang.

The prosecution's gang expert briefly described the loose structure of the gang, noting that it did not have a formal leader but rather operated on a more informal "understanding and a respect" basis, but there was no evidence showing how the predicate offenses were related to that loose hierarchy or structure or "to the gang as an organized, collective enterprise." (*Clark, supra*, 15 Cal.5th at p. 761, fn. omitted.) The evidence did not show, for example, that the *predicate offenses* were ordered by well-respected gang members or were motivated by a common expectation that gang members commit certain types of offenses. (*Id.* at p. 762.) Nor was there evidence that any potential proceeds from the second degree robbery predicate offense had to be paid to the gang rather than kept for personal gain. (Cf. *Clark*, at p. 750 [gang expert was not aware of any expectation for gang members to give proceeds from a robbery or burglary to the gang unlike other gangs that had specific requirements to " 'pay upstairs' " a portion of the proceeds to the gang after such crimes].)

It is true that the predicate offenses were also primary activities of the NSGC gang, and could conceivably benefit the gang. But the same was true in *Clark* where the gang expert testified that the predicate offenses were for several of the loosely structured gang's identified primary activities and yet the Supreme Court still found that there was no evidence in the record from which a jury could have found the required nexus between

14

the predicate offenses and the gang as an organized, collective enterprise beyond a reasonable doubt.  (*Clark, supra*, 15 Cal.5th at pp. 750, 764.)

Like in *Clark*, Detective Morales' testimony here did not address whether the predicate offenses were otherwise related to the organizational structure of the gang even if he described various ways that the offenses might benefit the gang.  Although he testified the gang's primary motive was to make money, he did so *not* in the context of linking the predicate offenses to the gang as a collective enterprise, but rather generically when discussing "hybrid gangs," which he described as groups that associate with both Bloods and Crips.  Nothing in the record shows that any of the predicate offenses were committed based on some sort of hybrid agreement between the NSGC gang and another gang as a means of increasing its income.

And to the extent the People argue that hiding and sharing guns was a common activity among NSGC members, the gang expert did not necessarily link that activity to the predicate offenses of illegally possessing a firearm as a felon or an addict nor is there testimony regarding the underlying nature of the predicate convictions that might have provided the necessary link.  By contrast, we note the difference in the gang expert's testimony describing a 2017 incident that occurred during a gang dispute between NSGC and a rival gang, the Flyboys.

In the 2017 incident, NSGC gang member Michael Young (whose March 2014 felon/addict in possession conviction was offered as one of the predicate offenses) obtained firearms from a residence in NSGC territory, used those firearms to shoot up a suspected Flyboys gang member's home as revenge over a disputed gang killing, and then returned to the house in the NSGC territory to stash the weapons, which were later recovered and matched to the casings found at the shooting scene.  While the gang expert's testimony regarding the 2017 incident arguably showed a link or nexus to the NSGC gang as an organization and one of its goals of challenging rival gang members,

15

no similar testimony was provided regarding Young's 2014 predicate offense for illegally possessing a firearm.

Based on the record here, we cannot conclude beyond a reasonable doubt that the jury would have found the required organizational nexus between the predicate offenses and the gang as a collective enterprise, which is conceptually distinct from the common benefit element.[6] (*Clark, supra*, 15 Cal.5th at p. 763.) As such, we cannot find beyond a reasonable doubt that the instructional error did not contribute to the verdict obtained.

The gang offenses and gang enhancements must be vacated and the matter remanded for further proceedings to allow the prosecution the opportunity, if it chooses, to meet the new statutory requirements for proving gang crimes and allegations under amended section 186.22. Accordingly, we shall reverse the convictions on counts 6 and 14 convicting defendant of active participation in a criminal street gang (§ 186.22, subd. (a)); vacate the true finding on the gang-related firearm enhancement on count 1 (§ 12022.53, subd. (e)(1)); vacate the true findings on the gang enhancement allegations on counts 1 through 5 and 7 through 9 (§ 186.22, subd. (b)(1)); reverse the conviction on count 11, carrying a concealed firearm in a vehicle as an active participant in a criminal street gang (§ 25400, subd. (c)(3)); and reverse the conviction on count 12, carrying a loaded firearm in a vehicle as an active participant in a criminal street gang (§ 25850, subd. (c)(3)). The prosecution will have the option to retry these counts and enhancements on remand.

---

[6] Defendant also contends there was no evidence that the predicate offenses benefited the gang in a way that was more than reputational. (See § 186.22, subds. (e)(1), (g).) The People reassert that this contention is not properly before us as it was not made under a separate heading with citations to the record. (See Cal. Rules of Court, rules 8.204(a)(1)(B) & 8.360(a).) Ultimately, we need not reach the issue given our determination on the collective engagement issue. (§ 186.22, subd. (f).)

## II

### *Senate Bill No. 567*

During the pendency of this appeal, the Governor signed Senate Bill 567, effective January 1, 2022, which made changes to section 1170 affecting trial courts' sentencing discretion.  Senate Bill 567 "applies retroactively . . . as an ameliorative change in the law applicable to all nonfinal convictions on appeal." (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039, fn. omitted; accord, *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109; see generally *In re Estrada, supra*, 63 Cal.2d 740.)

We requested supplemental briefing on Senate Bill 567.[7]  In their supplemental briefing, defendant and the Attorney General focus on section 1170, subdivision (b)(1) and (2), added by Senate Bill 567.  (Stats. 2021, ch. 731, §§ 1.3, 3(c).)  These provisions generally limit a trial court's ability to impose upper term sentences unless aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or by the court in a court trial.  (§ 1170, subd. (b)(1), (2).)  An exception to this general rule is evidence of the defendant's prior convictions established by certified records of conviction, which need not be submitted to a jury.  (§ 1170, subd. (b)(3).)

We conclude Senate Bill 567 requires remand for resentencing.  We reach this conclusion, however, for reasons the parties did not address in their supplemental briefing, though they had the opportunity to do so.  (See Gov. Code, § 68081 ["Before . . . a court of appeal . . . renders a decision in a proceeding other than a summary denial of a petition for an extraordinary writ, based upon an issue which was not proposed or

---

[7]     Our request for supplemental briefing stated:  "Senate Bill No. 567 (2021-2022 Reg. Sess.), effective January 1, 2022, among other things, amended . . . section 1170 and incorporated amendments to that section made by Assembly Bill No. 124 (2021-2022 Reg. Sess.) and Assembly Bill No. 1540 (2021-2022 Reg. Sess.).  What effect, if any, do these amendments have on defendant's appeal?"

17

briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing"]; see also *People v. Alice* (2007) 41 Cal.4th 668, 677 [Gov. Code, § 68081 "does not require that a party actually have briefed an issue; it requires only that the party had the opportunity to do so"].)

In addition to the changes described *ante*, Senate Bill 567 added subdivision (b)(6) to section 1170.[8] (Stats. 2021, ch. 731, §§ 1.3, 3(c).) Insofar as relevant here, section 1170, as amended, provides: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] . . . [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (§ 1170, subd. (b)(6).) Section 1016.7, subdivision (b) defines a " 'youth' " as "any person under 26 years of age on the date the offense was committed."

At the time of the charged crimes, defendant was 21 years old. As such, he was a youth within the meaning of sections 1016.7, subdivision (b) and 1170, subdivision (b)(6)(B).

Prior to imposing sentence, the trial court briefly addressed the need for a *Franklin* hearing for defendant as a youthful offender.[9] However, there is no indication in the record that the court otherwise considered defendant's youthfulness in imposing sentence

---

**8** This particular change was effected by Senate Bill 567 incorporating amendments to section 1170 made by Assembly Bill No. 124 (2021-2022 Reg. Sess.). (Stats. 2021, ch. 731, §§ 1.3, 3(c).)

**9** *People v. Franklin* (2016) 63 Cal.4th 261.

and it certainly did not consider whether the lower term was appropriate under section 1170, subdivision (b)(6).

The trial court sentenced defendant without the benefit of this amendment to section 1170, and the court's ruling was therefore an abuse of discretion. (See *People v. Carmony* (2004) 33 Cal.4th 367, 378 [court that is unaware of the scope of its discretion necessarily abuses that discretion].) " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) " 'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Ibid.*)

Here, the record does not clearly indicate the trial court would have made the same sentencing choices had it been aware of the scope of its discretion. Accordingly, we shall remand for full resentencing. (*People v. Flores, supra*, 73 Cal.App.5th at p. 1039 [where the defendant was under the age of 26 at time of the crime, appropriate approach is to "remand to the trial court to decide under the newly amended law whether defendant is entitled to the lower term"]; see also *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"], citing *People v. Buycks* (2018) 5 Cal.5th 857, 893 & *People v. Navarro* (2007) 40 Cal.4th 668, 681.) In light of our determination, we need not address the parties' arguments addressed to section 1170, subdivision (b)(1)-(3).

19

## III

### *Assembly Bill No. 518*

Defendant asserts that, due to amendments to section 654 made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518), the firearm use enhancements attached to counts 3 and 4 must be stayed. We are vacating defendant's sentence and remanding for a full resentencing, either after retrying defendant on the gang-related counts and enhancements or after the prosecution elects not to do so. As a result, the parties' contentions concerning Assembly Bill 518 have been rendered moot.

## DISPOSITION

We reverse the convictions on counts 6 and 14, active participation in a criminal street gang (§ 186.22, subd. (a)), count 11, carrying a concealed firearm in a vehicle as an active participant in a criminal street gang (§ 25400, subd. (c)(3)), and count 12, carrying a loaded firearm in a vehicle as an active participant in a criminal street gang (§ 25850, subd. (c)(3)). We vacate the true findings on the gang-related firearm enhancement allegation on count 1 (§ 12022.53, subd. (e)(1)), and the gang enhancement allegations on counts 1 through 5 and 7 through 9 (§ 186.22, subd. (b)(1)). Defendant's sentence is vacated. We remand the matter to the trial court to provide the prosecution with the opportunity to retry counts 6, 11, 12, and 14, as well as all the section 186.22, subdivision (b)(1) enhancement allegations and the section 12022.53, subdivision (e)(1) enhancement allegation attached to count 1 under the law as amended by Assembly Bill 333. At the conclusion of retrial or at such time as the prosecution elects not to retry the reversed counts and vacated enhancement allegations, the trial court shall provide defendant with a full resentencing in compliance with section 1170 as amended by Senate Bill 567 as well

as section 654 as amended by Assembly Bill 518.  In all other respects, the judgment is affirmed.

                                                 _____

                                                 HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

KRAUSE, J